MANSON L. REICHERT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 23495, 29928.   Promulgated March 10, 1953.

*Wilbur F. Dassel, Esq.*, and *William T. Boden, C. P. A.*, for the petitioner.

*Elmer E. Lyon, Esq.*, for the respondent.

OPINION.

TURNER, *Judge:* The respondent has determined that the petitioner received additional income from specific sources, and contends that such income was either a "pay off" for political favors rendered or the "sale of political influence." The burden of proving respondent erred in determining the deficiencies is on the petitioner.

In the main, the issues here involve transactions of which no record was made. In some instances, as in the case of the Republican United Finance Committee, reference is made to records and documents

for the purpose of showing the absence of entries which should have been found, if some of the testimony given is to be believed. In numerous instances there were direct conflicts and contradictions in testimony herein and all of it cannot represent the truth. We have seen and heard the witnesses and, after hearing their testimony and on the basis of the impressions received of those witnesses at the trial, we have re-examined such testimony as it appears of record, and in our findings have arrived at what we regard as the facts in the various situations.

For the purposes of our discussion of the income items, the issues may be divided into two parts, one having to do with the purported employment of petitioner's daughter Maybelle by Benjamin H. Bartlett, and the other having to do with amounts received by petitioner under the guise of political contributions but which, according to respondent's determination, were received by petitioner as political "pay offs" or in the sale of political influence.

The question whether the petitioner is taxable on payments made by Bartlett under the guise of salary to Maybelle and, if so, to what extent he is taxable is common to all the years before us. The respondent has determined that the full amounts of $3,600 for each of the years 1943, 1944, and 1945, and of $3,300 for the year 1946 were payments to petitioner and constituted income to him. While the record is not very clear on the point, it appears that Bartlett's tenure as manager of the motor vehicle branch at Evansville terminated on December 1, 1946, and if so, that accounts for the fact that the payments for 1946 were only $3,300 instead of $3,600, as in each of the first 3 years.

While petitioner and Bartlett, who was called as a witness by the respondent, did contradict each other in much of their testimony, they were in agreement on the following matters: They had worked together in politics and had been close political and social friends; that petitioner was appointed chairman of the Republican County Central Committee of Vanderburgh County in May 1942, and served as such through the period herein; that Bartlett had helped petitioner to be elected mayor of Evansville in 1942; that as chairman of the County Central Committee petitioner could, in effect, name the manager of the local motor vehicle license branch; that petitioner had Bartlett appointed to that position; that petitioner's daughter Maybelle was placed on Bartlett's payroll at a salary of $3,600 a year for all but 1 month of Bartlett's tenure; that some checks issued in Maybelle's name were delivered by Bartlett to petitioner; and that Bartlett paid to petitioner in July or August 1946, cash, less withholding tax, representing the last 5 months of Bartlett's last year as manager of the bureau, which payment was for services Maybelle had not rendered.

Admitting that he had Bartlett appointed manager of the local branch, it was petitioner's testimony that Bartlett had asked for the position and he gave it to him because Bartlett had worked in the organization when petitioner was elected mayor. As to the placing of his daughter on Bartlett's payroll, his only explanation or justification seems to be that it was Bartlett's idea and suggestion. We are convinced, however, that it was understood that Maybelle was to do little, if any, work and that her name was placed on the payroll to cover the payments Bartlett was to make to petitioner and that Bartlett was telling the truth when he testified that his interest in putting Maybelle on the payroll was so that he would have a basis for claiming deduction of the payments in reporting his income tax, whereas payments to petitioner of the amounts in question, without some such arrangement, would not.

Maybelle had never really been employed prior to this so-called employment, she was inexperienced in the type of work to be done, and she was planning to be married within the immediate future, her marriage taking place in February after she had purportedly gone to work in January. Presumably, it had not been necessary for her to work, since her father was a man of some means. She acknowledged that she considered the position as a "snap" that she was inexperienced, and that under the arrangement she could go to work when she pleased. And yet, she also testified that Bartlett was in desperate need for help and prevailed upon her to take the position. Most of the work she did was in the "rush season" between January 1 and March 31, but when she did report to work, it was not before 10:00 a. m. Had she considered herself a regular employee, she would, in reason, have expected to work as such, and certainly would have known what the office hours were and that a week's work was 5½ days, instead of 5 days. Nor would she have been paid a salary that was not only more than was paid other girls doing comparable work, but was in excess of the compensation received by Bartlett's experienced office manager.

As to the recipient of the final payment of Maybelle's so-called salary, there is a pointed contradiction in Maybelle's testimony and that of petitioner. Petitioner and Bartlett testified that Bartlett took the salary for the last 5 months of 1946 in cash, less withholding tax, to petitioner at his office, while Maybelle was positive in her testimony that the cash was delivered to her in person by Bartlett at her home. Maybelle had not been present in the court room when her father testified, but had heard Bartlett's testimony. It is of little consequence, however, whether petitioner or his daughter received the allotted salary payments from Bartlett. The arrangement was for petitioner to share with Bartlett some of the income Bartlett was to receive as manager of the bureau. Except to the extent hereafter stated, the

payments pursuant thereto, whether to petitioner or Maybelle, were petitioner's. If petitioner chose to let all the money go to his daughter, he would be no less taxable on it, and that would be true whether or not she knew of the arrangement between her father and Bartlett. We are convinced that Bartlett would not have received the appointment otherwise and that the salary arrangement was a subterfuge to hide the true facts. We do think that Maybelle did actually do a limited amount of work at the office during the first 3 months of 1943, 1944, and 1945, and she may have done some few jobs at her home, and to the extent of work so done, the payments received by her as salary were her income. Applying the rule laid down in *Cohan* v. *Commissioner*, 39 F. 2d 540, we have carefully examined the evidence of record and bearing heavily against petitioner for failure to bear his burden of proof, we have concluded and found as a fact that Maybelle earned on work done for Bartlett $100 in each of the years 1943, 1944, and 1945. The remainder of the amounts paid in those years under the guise of salary to Maybelle was the income of petitioner. In 1946, the evidence fails to show that Maybelle did any work and the entire $3,300 paid in that year under the guise of salary to her was petitioner's income.

The remaining issues as to the receipt of income not reported raise the question of whether or not certain amounts brought in by Bartlett, Alvin R. Brown, Jesse Patterson, and Albert A. Bradford were received by petitioner as his own, in return for political favors but under the guise of political contributions.

Petitioner in his testimony categorically denied that he received any payments such as those involved herein, as political contributions or otherwise, from the individuals named, and further, that all contributions which he did receive were transmitted, along with the names of the contributors, to the Republican United Finance Committee, as required by the contract and agreement between that committee and the Republican Central Committee for Vanderburgh County. As to his receipt of money from individuals named, his testimony and theirs are in direct contradiction. Each of them testified that he did deliver the money in question to petitioner, and after seeing and hearing them on the witness stand and giving careful consideration to their testimony, we believe they were telling the truth.

As to the amounts received by petitioner from Bartlett as contributions from tavern keepers and "bookies," in 1944 and 1946, we do not believe that petitioner received such funds as his own. While they were delivered to petitioner in his office, we think that the true picture was that they were received by him as campaign contributions for use in Evansville and that they were used, as indicated by the testimony of witnesses, as "pay offs" to precinct committeemen and pre-

cinct workers. In each instance the money was not retained by petitioner but was immediately turned over to Julius Ritter, who served under the designation of subtreasurer of the county committee, and with respect to money brought in in 1944, Ritter, in turn, on the eve of the elections had the currency received changed into $1 bills and in that form the money was distributed, the major portions being distributed on the eves of the elections, in one instance from the mayor's office, and in the other from a room in a local hotel. The remainder was dispensed on election day in the precincts themselves. When the $6,800 was brought in in the spring of 1946, it was concluded that Ritter should hold the money for use in the general election, since there was not much opposition in the primary. While it may be true that the manner of soliciting the funds in question and the method in which they were used were in conflict with the contract between the county committee and the Republican United Finance Committee and in violation of the Corrupt Practices Act of Indiana, the enforcement of that contract and the Indiana Corrupt Practices Act is not within our province. The funds in question were not delivered to petitioner, received by him as his own, or appropriated to his own uses. To the contrary, they were received by him to be used for political campaign purposes and they were so used or turned over to Ritter for such use at a later election. They did not become the gross income of the petitioner.

As to the amounts paid to petitioner by Alvin R. Brown, the facts are different and we have so found. The first contribution was $5,000 in 1945. Brown's company was in the wholesale liquor business. When the company's license was up for renewal, the renewal was not granted in ordinary course, and word was passed on to Brown that a "contribution" would probably serve to eliminate the difficulty. Brown saw petitioner and offered $3,000, but was told the amount was not adequate. A $5,000 payment was finally agreed upon and paid. No part of this amount was ever reported to the state organization. It is our opinion, and we have concluded, that it was not paid as a political party contribution and that it was not so intended, but that petitioner received it as recompense for removing the obstacles from the renewal of the license. The payment was made in 1945, which was not an election year. Brown and his associates made another "contribution" in 1946. That amount was not reported by petitioner to the state headquarters, and he denied that he received it. We have concluded that the character of this payment was the same as that made in the prior year.

As to the payments by Jesse Patterson and Albert A. Bradford, the record is not so clear. Patterson was a tavern keeper. He was a

Republican and his testimony was that he paid $500 in cash to petitioner in the spring of 1944 and made another payment of $1,000 in the fall, as contributions to the campaign fund. In each instance, petitioner took the money and, thanking Patterson, put the money in his pocket. With that testimony, the record of the $1,500 ends. The petitioner categorically denied that he ever received any amounts from Patterson, although Patterson had testified that the payments were made in petitioner's office, the first in the presence of Clarence Coogan and Bartlett and the second in the presence of Bartlett. Neither of these "contributions" was reported by petitioner to the state organization, and since petitioner denied receipt of the moneys in the first instance, there is no basis for any conclusion that he turned the money over to Ritter or anyone else for use in the campaign, as was true of the funds solicited and brought in by Bartlett. For failure of proof, the respondent is sustained in his inclusion of the $1,500 paid by Patterson to petitioner as petitioner's income. Similarly, the respondent's determination is sustained, for lack of proof, with respect to $25 of the $75 contributed by Albert A. Bradford. The picture there is substantially comparable to that in the case of the money paid over by Patterson. Petitioner denied that he received any amount, although a contribution of $50 from Bradford was later reported to the state organization. For failure of proof, the respondent is sustained to the extent of the $25, which petitioner received but did not transmit to the state organization.

On the fraud issue, it is our conclusion that the respondent has amply met his burden of proof. We are convinced, and our findings indicate, that petitioner well knew that the payments by Bartlett under the guise of salary to Maybelle were being made in return for petitioner's influence in obtaining Bartlett's appointment as director of the automobile license bureau for Vanderburgh County. We are also convinced that petitioner was well aware of the income tax implications and that his idea was comparable to that of Bartlett, namely, that by putting Maybelle on Bartlett's payroll the arrangement would have an outward appearance of respectability and that he would receive and retain such portions of the moneys as pleased him, without the income tax consequences. He also well knew and understood that little, if any, services were to be expected of his daughter. Part of the deficiency in each of the years before us was due to fraud on the part of petitioner with intent to evade tax.

Having concluded that there was fraud in each of the years in question, the decision is also for the respondent on the statute of limitations issue with respect to 1943.

*Decisions will be entered under Rule 50.*