UNITED STATES of America, Appellee,

v.

Joseph R. PISANI, Defendant-Appellant.

No. 686, Docket 84–1330.

United States Court of Appeals,
Second Circuit.

Argued Jan. 28, 1985.

Decided Sept. 12, 1985.

---

**400**

Charles G. LaBella, Asst. U.S. Atty., New York City, for the S.D. of N.Y. (Rudolph W. Giuliani, U.S. Atty. for the S.D. of N.Y., Stacey J. Moritz, Asst. U.S. Atty., New York City, of counsel), for appellee.

John R. Wing, New York City (Constance Cushman, Joel C. Schochet, Weil Gotshal & Manges, New York City, of counsel), for defendant-appellant.

Before NEWMAN, KEARSE, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Joseph R. Pisani appeals from a judgment of conviction entered on jury verdicts after a five-week trial before Hon. David N. Edelstein in the United States District Court for the Southern District of New York. The jury acquitted Pisani on eleven counts of mail fraud, and could not agree on ten counts relating to a real estate transaction, but convicted him on ten other counts of mail fraud, four counts of income tax evasion, and four counts of filing false income tax returns. Judge Edelstein sentenced Pisani to a total of four years' imprisonment followed by four years' probation, imposed fines totaling $69,000, and, on one of the mail fraud counts, required restitution to a former law client of defendant in the amount of $3,604.

On appeal Pisani raises numerous issues, of which the following require discussion: (1) whether Judge Edelstein's conduct deprived Pisani of a fair trial; (2) whether the grand jury that returned the indictment was lawfully constituted; (3) whether the trial court erred in instructing the jury that political contributions used for personal purposes constituted taxable income; and (4) whether Pisani's conduct in using campaign funds for personal purposes and then falsely reporting those personal expenses as campaign expenditures violated the federal mail fraud statute.

We reverse and dismiss the nine mail fraud counts that are based on filing false reports of campaign expenditures (counts 12, 13, 15, 16, 18, 22, 23, 25, and 26), and we reverse and remand for a new trial on the income tax charges (counts 32 through 39). We affirm the conviction on the mail fraud charge that involved funds of one of Pisani's former clients (count 28).

### BACKGROUND FACTS

Pisani was originally elected to the New York State Senate for the 62nd District in Westchester County in 1972 and was reelected to that position every two years up through 1982. During that ten-year period Pisani also campaigned for the offices of New York State Attorney General, Westchester County Executive, and Governor of New York State.

In addition to his public activities, Pisani maintained an active law practice in association with two other lawyers in Westchester County, first as a partner from 1976 to 1980, and thereafter until 1983, as counsel to the firm.

### PROCEEDINGS BELOW

On March 8, 1984, the government filed a 39-count indictment against defendant and one Kathryn Godfrey. For discussion purposes, the charges of the indictment can be viewed in four groups:

1. *Mallon real estate transaction.*

Counts 1 through 10 focused on an alleged transaction by which Pisani purchased a summer home from Joseph and Roberta Mallon, and compensated them by providing Joseph Mallon with a no-show job

in a state agency. Included in these counts were charges of mail fraud against the state agency, perjury, obstruction of justice, subornation of perjury, and conspiracy to commit mail fraud and perjury and to obstruct justice. Godfrey was named as a codefendant on two counts of perjury (counts 6 and 7), and one count of obstruction of justice (count 9). In all other counts of the indictment Pisani was the only defendant.

## 2. *Campaign fund mail fraud.*

Counts 11 through 26 charged defendant with mail fraud based on his use of campaign funds for personal purposes and filing false reports of his campaign expenditures.

## 3. *Law practice mail fraud.*

Counts 27 through 31 charged Pisani with mail fraud in his dealings with his law partners and clients.

## 4. *Tax violations.*

Counts 32 through 39 charged Pisani with four years of income tax violations.

After a one-month trial and 3½ days of deliberations the jury could not agree on any of the ten counts relating to the Mallon real estate transaction; it found him guilty on nine and acquitted him on seven of the campaign fund mail fraud counts; it found him guilty on one and acquitted him on four of the law practice mail fraud counts; and it found him guilty on all eight of the income tax counts.

As to defendant Godfrey, who is not a party to this appeal, the jury acquitted her on one count of perjury, and could not agree on the other two charges brought against her.

On the nine campaign fund mail fraud convictions Judge Edelstein sentenced Pisani to nine concurrent three-year prison terms and nine $1,000 fines. On the law practice mail fraud conviction, which involved a client's escrow account, Judge Edelstein sentenced Pisani to a three-year prison term, but suspended execution of

sentence and imposed probation of four years to commence on his release from prison, on condition that Pisani pay restitution of $3,604 to the defrauded former client. On the four income tax evasion convictions, Judge Edelstein sentenced Pisani to four three-year prison terms to run concurrently with each other and with the nine mail fraud jail sentences, plus four $10,000 fines. On the four convictions for filing false income tax returns, Judge Edelstein sentenced Pisani to four one-year prison terms, to run concurrently with each other, but consecutively to the other sentences, plus four $5,000 fines. Overall, therefore, Pisani was sentenced to four years in prison to be followed by four years' probation, fined a total of $69,000, and required to pay restitution of $3,604.

### ISSUES

On appeal Pisani raises a variety of claims. Some of them are rendered moot by our conclusions on other issues; others have been carefully reviewed and found to be lacking both in merit and jurisprudential significance. Of the claims discussed below two are directed at all counts on which Pisani was convicted: (1) that the trial judge's misconduct deprived him of a fair trial, and (2) that the indicting grand jury was not legally constituted. In addition, Pisani attacks his convictions of mail fraud by use of the mails to embezzle, divert, and convert money from his campaign funds and concealment of the diversions and embezzlement on the ground that his conduct as proved is not proscribed by the federal mail fraud statute. He attacks all of his tax convictions, on the ground that the trial court erred in removing from the jury the issue of whether or not his campaign contributions were gifts and therefore not includable in gross income. Pisani raises no argument on appeal, however, that is directed particularly at his conviction on count 28 of mail fraud with respect to the client's escrow account.

### DISCUSSION

## A. *Judge Edelstein's Conduct.*

Pisani contends that Judge Edelstein's "hostile and disparaging" treatment of de-

fendant, defense counsel, and defense witnesses during the trial, combined with his "coercive and demeaning" treatment of the jurors, deprived Pisani of his constitutional rights to a fair trial, due process, and the effective representation of counsel. This alleged judicial misconduct, he claims, entitles him to a new trial.

 Reviewing Pisani's claim is difficult because, of course, we are unable to observe directly the interaction of personalities during trial; our review is necessarily limited to " 'the cold black and white of a printed record' ". *United States v. Grunberger*, 431 F.2d 1062, 1067 (2d Cir.1970) (quoting *United States v. Ah Kee Eng*, 241 F.2d 157, 161 (2d Cir.1957)). For this reason, we have no handy tool with which to gauge automatically whether the trial judge's conduct has improperly tipped the balance of the trial against the defendant. *United States v. Nazzaro*, 472 F.2d 302, 304 (2d Cir.1973). Our disposition of the claim must flow from careful deliberation after close scrutiny of the record. Our role, however, is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied Pisani a fair, as opposed to a perfect, trial. *United States v. Robinson*, 635 F.2d 981, 984 (2d Cir.1980), *cert. denied*, 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981). If we conclude that the conduct of the trial had so impressed the jury with the trial judge's partiality to the prosecution that this became a factor in determining the defendant's guilt, then the convictions should be reversed. *United States v. Guglielmini*, 384 F.2d 602, 604 (2d Cir.1967). In light of these general standards we turn to Pisani's various complaints about Judge Edelstein's conduct.

### 1. *Rulings on objections.*

 Pisani first objects to the manner in which Judge Edelstein ruled on objections throughout the trial, emphasizing that Pisani's counsel usually came out on the losing side. Of course, a trial judge must be ever conscious of the special attention and respect he commands from the jury and must exercise caution to maintain an appearance of impartiality. *United States v. Vega*, 589 F.2d 1147, 1153 (2d Cir.1978). But a trial judge must rule on countless objections, and a simple numerical tally of those sustained and overruled, one which here favors the government, is not enough to establish that the scales of justice were tipped against a defendant. Of far greater importance is the correctness and fairness of the judge's evidentiary rulings.

 After carefully reviewing the trial transcript we conclude that Judge Edelstein's rulings on objections from both sides were generally sound. Pisani has not pointed to any prejudicially erroneous rulings, and lacking such support, we will not fault the trial judge simply because defense counsel would have preferred a more favorable scorecard. There were numerous instances when the trial judge did sustain defense objections. Moreover, if defense counsel objects when objections are unwarranted—as he did on numerous occasions—he can hardly complain that "it is hard to find a defense objection that was sustained." Similarly, if defense counsel pursues an objectionable line of questioning, he can hardly cry "foul" when the judge sustains a government objection or even excludes the testimony *sua sponte*.

### 2. *Requiring written argument on objections.*

 Defendant next complains that "the most shocking illustration of the trial court's prejudicial partiality was his imposition on defense counsel—*and only defense counsel*—of the novel and totally unfair procedural requirement that objections be made by means of written notes". In the first place, this assertion is untrue; Judge Edelstein also required the government to write out its objections on occasion. Second, Judge Edelstein required written submissions only with respect to extended arguments; as the record shows, he enter-

tained repeated oral objections from both sides, and allowed brief side bar conferences at the request of either party. Third, Judge Edelstein adopted this procedure to avoid distracting the court and jury from the examination of witnesses, and we have long recognized that a trial judge has wide discretion to adopt methods designed to expedite a trial. *United States v. Dardi,* 330 F.2d 316, 330 (2d Cir.), *cert. denied,* 379 U.S. 845, 85 S.Ct. 51, 13 L.Ed.2d 50 (1964). This procedure effectively served that end.

Finally, Pisani claims prejudice because the practice allowed evidence to be received and absorbed by the jury before the court could make a considered ruling on the objection. Aside from the fact that the trial judge could have cured most prejudicial effects by proper instructions to the jury, the defendant points to no instance, nor do we find any, where prejudicial evidence was erroneously revealed to the jury under this practice and then later excluded.

### 3. *Questioning defense witnesses.*

Pisani also contends that Judge Edelstein exceeded the proper scope of his duties by interrupting defense counsel to ask questions of both Pisani and the other defense witnesses. But as Judge Edelstein colorfully informed this jury, a trial judge need not sit like "a bump on a log" throughout the trial. He has an active responsibility to insure that issues are clearly presented to the jury. *Vega,* 589 F.2d at 1152. Thus, the questioning of witnesses by a trial judge, if for a proper purpose such as clarifying ambiguities, correcting misstatements, or obtaining information needed to make rulings, is well within that responsibility. *United States v. Bronston,* 658 F.2d 920, 930 (2d Cir. 1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982). Here, some of the interruptions were invited by defense counsel's often ambiguous or repetitive questions. *See United States v. Pellegrino,* 470 F.2d 1205, 1207 (2d Cir.1972), *cert. denied,* 411 U.S. 918, 93 S.Ct. 1556, 36 L.Ed.2d 310 (1973). Even though it is

sometimes difficult to tell from the written record whether a judge's questions unfairly disparaged the defense, *see Grunberger,* 431 F.2d at 1067, it does not appear here that the judge's limited questioning of either the defendant or the other defense witnesses exceeded any proper bounds or conveyed to the jury any impression of the judge's belief in the defendant's probable guilt. *See United States v. De Sisto,* 289 F.2d 833, 835 (2d Cir.1961).

### 4. *Criticisms of counsel.*

Somewhat more troubling for us is the abrupt tenor of some of Judge Edelstein's instructive and evaluative comments to defense counsel. We have repeatedly insisted that a trial judge display patience with counsel "so as not to prejudice a party or create an impression of partisanship before the jury", *see, e.g., United States v. Pellegrino,* 470 F.2d at 1207. However, we must also keep in mind the enormous pressures placed upon our trial judges by their ever-expanding dockets and the increasing complexity of modern trials, and we recognize that those pressures, particularly in a protracted case, can on occasion cause even the most imperturbable judge to vent irritation or impatience that ideally should be suppressed. *See United States v. Nazzaro,* 472 F.2d at 304.

With distressing frequency, however, Judge Edelstein made comments in the jury's presence that could better have been avoided, such as needlessly characterizing counsel's questions or statements as "improper" and "completely without merit". He also may have suggested to the jury a negative perception of defense counsel's competence by directing him to "stop mumbling", by stating that a particular line of questioning was "a bore and a waste of time", and by implying several times that counsel was misleading the jury.

While we regard such unnecessary barbs most seriously, we have carefully evaluated the incidents complained of and, on balance, have concluded that they did not deprive defendant of a fair trial. At least some of Judge Edelstein's comments

were provoked by counsel's continuing to do things that the court had specifically cautioned him to avoid, a factor that properly may be taken into account to determine whether defendant was prejudiced. *Robinson*, 635 F.2d at 985.

Moreover, as serious as some of the incidents are, they occupy but a very small part of this extensive trial record. Most importantly, Judge Edelstein at least partially mitigated the possibly prejudicial impact of his comments by explaining to the jury several times that his admonishments of counsel should have no bearing on their deliberations or determinations. *See id.* Fortunately, he also saved his most intemperate comments for delivery outside the presence of the jury. Viewing the record as a whole, therefore, we conclude that while some of the trial judge's comments and behavior toward defense counsel were regrettable, they did not convey to the jury an impression of partiality toward the government to such an extent that it became a factor in their deliberations.

### 5. *Treatment of jurors.*

We find no support in the record for Pisani's assertion that Judge Edelstein treated the jurors in a demeaning fashion. On the contrary, Judge Edelstein seems to have established a friendly rapport with the jurors and made reasonable efforts to help them deal with the inconvenience attendant to jury service in any lengthy trial.

 Finally, we reject Pisani's assertion that Judge Edelstein coerced a verdict by his statements to the jurors on Thursday, the third day of deliberations, when he informed them that they would have to deliberate through the weekend if they did not reach a verdict by Friday. Although some of his comments concerning the difficulties faced by judges, court personnel, and others involved in the trial process could better have been omitted, nothing he did say exceeded a permissible level of encouragement to the jurors to responsibly pursue their duties as jurors. *See United States v. Bermudez*, 526 F.2d 89, 100 (2d

Cir.1975), *cert. denied*, 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976).

In short, we reject Pisani's claim that Judge Edelstein's conduct at trial, whether viewed as separate incidents or as a whole, deprived Pisani of a fair trial or effective representation of counsel.

### B. *Validity of the indictment.*

Pisani attacks the validity of his indictment, claiming that the term of the grand jury had expired because the rule under which it had been extended was illegally adopted. This attack rests on an intricate chain of reasoning. The grand jury that indicted Pisani was originally empanelled on March 23, 1982, for a term of 18 months to expire on September 23, 1983, the maximum term permitted by Fed.R.Crim.P. 6(g). An amendment to rule 6(g), which permits a six-month extension of a grand jury's term if the district court determines that the extension was "in the public interest", became effective on August 1, 1983. By order dated August 18, 1983, Chief Judge Motley of the Southern District of New York extended the term of Pisani's grand jury for six months to March 23, 1984. During the extension period the grand jury returned the original and first superseding indictments against Pisani, as well as the second superseding indictment on which he was tried.

Rule 6(g) was amended by the "report and wait" procedure set forth in 18 U.S.C. § 3771. Under that procedure, the Supreme Court is authorized to prescribe rules of "pleading, practice and procedure" for criminal cases. The rules are reported to congress and take effect after 90 days, unless rejected, postponed or amended by congress.

Relying upon *Costello v. United States*, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956), and *United States v. Fein*, 504 F.2d 1170, 1173–79 (2d Cir.1974), Pisani argues that he has a substantive right to be indicted by a grand jury that is independent from prosecutorial control and that the length of the grand jury's term is directly related to its independence. Pisani

reasons that since the tenure of the grand jury is thus a matter of substance, and not one of "pleading, practice or procedure", any attempted amendment by the "report and wait" procedure was invalid. He concludes that since the life of the grand jury had been extended pursuant to an invalidly adopted rule, his indictment was returned by a grand jury whose term had expired, and, under *United States v. Fein,* must be dismissed.

One flaw in Pisani's reasoning rests with his attempted characterization of the tenure of a grand jury as substantive, rather than procedural. Although we expressed concern in *United States v. Fein,* 504 F.2d at 1179, that grand jurors "might by dint of longer service become themselves arms of the state instead of representatives of the citizenry", we did not thereby create any substantive right to indictment within 18 months. Indeed, congress itself in 18 U.S.C. § 3331 has provided that the term of a grand jury empanelled pursuant to the Organized Crime Control Act may be extended to a maximum of 36 months, and we have upheld the validity of that statute. *United States v. Schwartzbaum,* 527 F.2d 249, 256 (2d Cir.1975), *cert. denied,* 424 U.S. 942, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976).

A further flaw in Pisani's argument is the fact that former rule 6(g) which established the 18 month term for a grand jury was adopted by the same "report and wait" procedure used to enact the challenged 1983 amendment. Pisani responds that the former rule merely restated law already on the books, 28 U.S.C. § 421, which had been enacted by express congressional action, but we see no significance to this historical fact. Its very nature, as well as its inclusion in the Federal Rules of Criminal *Procedure* (emphasis added), demonstrates the procedural character of the amendment to rule 6(g), which was adopted after a history of congressional experimentation with grand jury tenure. *See United States v. Fein,* 504 F.2d at 1173–79.

We conclude that Pisani's indictment by a grand jury whose tenure had been extended pursuant to the 1983 amendment of rule 6(g) was not invalidated by the manner in which the amendment authorizing that extension had been adopted.

## C. *The erroneous charge on income.*

Pisani contends that Judge Edelstein's jury instructions on the income tax counts improperly removed from the jury's consideration "the question of whether gifts to Pisani's campaign funds yielded taxable income to him when spent on personal items."

To prove a substantial tax due in this criminal case the government followed the "specific items" approach, whereby it presented evidence of specific items of claimed taxable income that Pisani had received but not reported on his relevant returns. With respect to his campaign contributions, the specific items relied upon by the government were those funds that Pisani had taken from his campaign funds and used for personal, rather than political, purposes.

One of Pisani's central contentions at trial was that the money contributed to his campaign by his supporters constituted nontaxable gifts to him because the money was donated without restriction as to use. Four of Pisani's witnesses testified substantially to that effect. One government witness, a former law partner of Pisani, testified that when he gave Pisani money he expected it would be used for campaign purposes. Pisani, himself, testified that he believed that a number of the contributions were unrestricted gifts that he was not required to report as income. A factual issue was thus generated as to whether the campaign funds Pisani used personally came from contributions and gifts that were unrestricted as to use. If so, should they have been excluded from Pisani's taxable income?

The Internal Revenue Code defines income to include all income received from any source, except as otherwise provided. 26 U.S.C. § 61. It is "otherwise provided", however, that the value of property ac-

quired by gift is not included in gross income. 26 U.S.C. § 102(a).

The fourth and sixth circuits have held that *any* funds contributed to a recipient's political campaign and then diverted to his personal use are income taxable to the recipient. *United States v. Miriani*, 422 F.2d 150, 152 (6th Cir.), *cert. denied*, 399 U.S. 910, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970) (criminal); *United States v. Jett*, 352 F.2d 179, 182 (6th Cir.1965), *cert. denied*, 383 U.S. 935, 86 S.Ct. 1063, 15 L.Ed.2d 852 (1966) (criminal); *O'Dwyer v. Commissioner*, 266 F.2d 575, 585–86 (4th Cir.), *cert. denied*, 361 U.S. 862, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959) (civil).

In reaching their conclusions in *Miriani, Jett,* and *O'Dwyer*, these courts all relied on a 1954 revenue ruling in which the IRS had declared that any political gift "used by a candidate or other individual for personal use constitutes taxable income to such candidate or other individual for the year in which the funds are so diverted." Rev.Rul. 54–80, 1954–1 C.B. 11, 12. In *Jett*, the court also cited *Reichert v. Commissioner*, 19 T.C. 1027, (1953), which stated a similar proposition, *see* 19 T.C. at 1038–39.

In 1968, however, the I.R.S. modified its position. It abandoned its absolute, inflexible rule that made taxable all personal diversions of campaign funds and adopted a rebuttable presumption focused upon the donors' intent. In Rev.Proc. 68–19 it stated that

> The service will presume in the absence of evidence to the contrary that contributions to a political candidate are political funds which are not intended for the unrestricted personal use of such recipient. If it can be shown that the funds were intended for the unrestricted personal use of the political candidate, then the Service will apply the principles set forth in *Commissioner v. Mose Duberstein, et al.*, 363 U.S. 278 [80 S.Ct. 1190, 4 L.Ed.2d 1218] (1960) * * * to determine whether or not the funds may [as gifts] be excluded from his gross income under section 102 of the Code.

Rev.Proc. 68–19, 1968–1 C.B. 810, 811.

Quoting Rev.Proc. 69–19 in *Stratton v. Commissioner*, 54 T.C. 255, 280 (1970), the tax court held that "[t]he line between an outright gift and a campaign contribution is a very thin line." The court then analyzed whether funds received by Stratton, the former governor of Illinois, constituted untaxable gifts. Based on the unequivocal testimony of several individuals that they had intended "to make *outright gifts* to [Stratton] to do with as he pleased with no strings attached", the court found that these transfers "were made from a 'detached and disinterested generosity,' 'out of affection, respect, admiration, charity or like impulses[,]' *Commissioner v. Duberstein*, 363 U.S. 278, 287, 80 S.Ct. 1190, 1197–1198, 4 L.Ed.2d 1218 (1960)" and therefore were not taxable income. *Stratton v. Commissioner*, 54 T.C. at 281.

■ We think that this approach is correct. *See United States v. Scott*, 660 F.2d 1145, 1164 & n. 37 (7th Cir.1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982). Moreover, it would be unfair to Pisani not to treat the question as a factual one when the commissioner and the tax court had, prior to the tax years in question, expressly declared that the question was factual.

■ Judge Edelstein, however, did not submit that issue of fact to the jury. He charged the automatic rule that was adopted by *Miriani, Jett,* and *O'Dwyer* and was based on Rev.Rul. 54–80. He charged the jury:

> [P]olitical contributions that are diverted to personal use are not gifts. They are includable in gross income in the year in which the funds are used personally.

In effect, therefore, he ignored Rev.Proc. 68–19 and *Stratton*, and he did so despite Pisani's specific request for a charge that would have permitted the jury to determine whether the political contributions were nontaxable gifts or taxable income. Although Pisani's counsel took no specific

exceptions after the charge was given, the charge was erroneous and the magnitude of its error was enhanced in the very next paragraph when Judge Edelstein instructed the jury to determine whether other moneys Pisani had received from clients were actually gifts as he claimed. The proper instruction on gifts from clients contrasted sharply with the immediately prior instruction that political contributions could not be gifts, and it virtually guaranteed Pisani's conviction on the tax counts. On this record, therefore, and in light of defendant's specific request to charge, we conclude that this erroneous instruction constituted plain error requiring reversal of all eight of Pisani's income tax convictions.

D. *Mail fraud based on Pisani's personal use of campaign funds.*

Pisani challenges his campaign fund mail fraud convictions on the ground that his conduct did not constitute the crime of mail fraud proscribed under 18 U.S.C. § 1341. That section provides:

> Whoever, having devised * * * any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, * * * for the purpose of executing such scheme or artifice [uses the mails, shall be guilty of a crime].

The "fraudulent scheme" charged against Pisani in paragraph 40 of the indictment was one

> to *obtain, divert* and *embezzle* at least $45,000 *unlawfully* from the Joseph R. Pisani Campaign Funds, to *convert* said funds to the personal use, enjoyment and benefit of the defendant PISANI * * *, and to conceal said *diversion* and *embezzlement.* (emphasis added).

The italicized words above support the thrust of Pisani's argument on this issue. He contends that his use of campaign funds for personal purposes was not unlawful and therefore that there simply was no "fraudulent scheme" as charged in the indictment.

At the heart of this issue lies the question of whether New York law required Pisani to use moneys contributed to his campaign fund solely for campaign purposes, and prohibited him from putting them to personal use. The government contends that applicable New York law did prohibit personal use of campaign funds, and that Pisani's conceded use of some of them for personal purposes constituted embezzlement and conversion. Pisani contends, and we agree, that at the time of the events in question, nothing in New York law prohibited a candidate from using campaign funds for personal purposes. Consequently, the "fraudulent scheme" charged in the indictment was not established at trial, and those campaign fund mail fraud counts on which Pisani was not acquitted must be dismissed.

1. *Factual background.*

Campaign funds of candidates for state offices in New York state are typically handled through a candidate's political campaign committees which collect contributions and disburse funds. Those committees, which often consist of no more than the candidate and a bookkeeper, are required to file statements of their receipts and expenditures periodically with the state board of elections. N.Y.Elect.Law §§ 14–110, 14–118 (McKinney 1978 & Supp.1984).

Senator Pisani maintained several political campaign committees that collected and disbursed funds for his candidacies for public office. Lillian Steinberg, Pisani's secretary, kept the books and prepared and filed with the New York State Board of Elections the required financial disclosure statements. These statements required identification of the recipient, amount, and purpose of all disbursements of $50 or more, and noted that any false statement was punishable as a misdemeanor. In preparing the statements, Steinberg obtained the required information by reviewing the campaign books and by asking Pisani for more information when the books did not provide an explanation.

It is undisputed that Pisani used substantial amounts from the campaign funds to pay personal expenses of himself, of members of his family, and of his codefendant, Kathryn Godfrey, as well as for various personal business investments. It is also undisputed that the corresponding entries on his disclosure statements did not accurately reflect the true purpose of those personal expenditures, and it may be, although we do not decide the question, that a scheme to defraud his contributors could have been alleged and proved.

As this particular case was charged by the grand jury and presented to the trial jury, however, the essence of the alleged fraudulent scheme was that Pisani unlawfully defrauded his own campaign funds for personal purposes. This position was set forth in the indictment, urged in the government's opening statement and summations, and reinforced by the charge of the trial judge who provided no separate description of the alleged scheme to defraud but, instead, simply referred the jury back to the scheme of embezzlement and conversion charged in the indictment.

As he presented what the case was about, in his opening statement, the prosecutor stated that

Pisani took money from his campaign funds to pay for personal expenses * *. Tr. 3

The fourth group of charges involves the campaign funds * * *. From these funds wre [sic] taken money by Joseph Pisani, Senator Pisani, for his personal expenses, for his personal use, not related to legitimate campaign expenses. Tr. 7

Finally, you will hear how Senator Pisani used his campaign funds like a personal bank account. The Senator freely took money from the campaign funds to pay for his vacation, to pay for expenseive [sic] gifts he gave to others and to pay for personal business investments. Tr. 15

The evidence will show that Senator Pisani withdrew money from his campaign funds for personal expenses and

falsely represented those expenditures on the financial disclosure statements. Tr. 15

You will hear many such examples of money taken out of the campaign funds, used for personal expenses and the purpose for the disbursement falsely represented on the disclosure statement filed with the Board of Elections. Tr. 17

In his main summation the prosecutor stated:

The government has proven that Senator Pisani engineered and carried out a scheme to defraud his various campaign committees by filing false financial returns, false financial disclosure statements. Tr. 2245

On his rebuttal summation the prosecutor repeated:

What the case is about, this case comes down to, is the 3 frauds, the Mallon house in Blooming Grove, New York, and the coverup of that transaction, the fraud against the law firm and the clients of the law firm, and the fraud against the campaign, the campaign funds. Tr. 2396

He further stated on rebuttal:

The real point here is that Joe Pisani used thousands of dollars in his campaign funds for personal expenses * * *. Not only that, he hid how he used that money. Tr. 2428

In at least two portions of his charge Judge Edelstein reinforced the prosecutor's view that these mail fraud charges involved a scheme to defraud the campaign funds. When reviewing the various counts of the indictment he stated:

Counts 11 through 26 charge that Joseph R. Pisani violated the mail fraud statute, Title 18 of United States Code, section 1341, by scheming to defraud his political campaign funds of at least $36,000 to pay personal expenses for himself, his family and others. Tr. 2446–7

When he discussed the elements of mail fraud, Judge Edelstein reminded the jury that it was "not necessary that the government prove every single allegation set

forth in that count of the Indictment", Tr. 2465, but that it was necessary that three elements be proved, including the existence of a fraudulent scheme. But he made no reference to either the proof or the government's contentions with respect to the fraudulent scheme and thereby left the jury to decide the case based on the indictment and the arguments, all of which focused upon the claim that Pisani had defrauded his own funds by taking from them moneys that he was not entitled to have for personal purposes, and by concealing what he had done by filing false disclosure statements through the mails.

### 2. *The Mail Fraud statute.*

█ The two key elements of a mail fraud violation are a scheme to defraud and use of the mails in furtherance of that scheme. Use of the mails is not in issue; we are concerned only with the alleged fraudulent scheme. Although congress has not defined the term "scheme to defraud", the federal courts have broadly interpreted it in determining the reach of the mail fraud statute. *United States v. Buckner,* 108 F.2d 921, 926 (2d Cir.), *cert. denied,* 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed.2d 1016 (1940). The United States Supreme Court has held that congress may forbid any use of the mails that furthers a scheme to defraud that it regards as contrary to public policy, even if congress could not forbid the scheme itself. *Parr v. United States,* 363 U.S. 370, 389, 80 S.Ct. 1171, 1182, 4 L.Ed.2d 1277 (1960). This versatility has led to the observation that

> [t]o federal prosecutors of white collar crime, the mail fraud statute is our Stradivarius, our Colt 45, our Louisville Slugger, our Cuisinart—and our true love. We may flirt with RICO, show off with 10b–5, and call the conspiracy law 'darling,' but we always come home to the virtues of 18 U.S.C. § 1341, with its simplicity, adaptability, and comfortable familiarity.

Rakoff, *The Federal Mail Fraud Statute* (Part 1), 18 Duq.L.Rev. 771, 771 (1980) (footnotes omitted). Even the best of rela-

tionships, however, must occasionally experience some strain, and in the context of Pisani's campaign fund mail fraud counts, we think that occasion has arrived.

### 3. *New York law on use of campaign funds.*

It seems clear that no provision of New York law in effect prior to this indictment prohibited a candidate from using campaign funds for personal purposes. Certainly, there was no express provision on the subject in the New York statutes, and both the attorney general and the board of elections of the state have rendered opinions indicating that nothing in New York's election law governs how campaign moneys that are not disbursed for campaign purposes may be spent.

In 1983 the attorney general was asked by a city government to consider

> whether a local government is authorized to enact regulations prohibiting the use or expenditure of campaign contributions for non-campaign related purposes.

Op.Att'y Gen., No. I–83–57 (Sept. 28, 1983). He concluded that precisely because state law does not address that issue, a locality may properly enact an ordinance prohibiting the personal use of campaign funds. His opinion reads, in part:

> [W]e have found no provision of the Election Law that deals with the disposition of surplus campaign funds. * * * Nor have we discovered from the legislative history of Article 14 of the Election Law or from the provisions of the Article any intent that reporting was viewed as a means to regulate the use of campaign funds. While disclosure may tend to inhibit the *personal use of funds,* such use *is not prohibited and is not subject to sanction.*

*Id.* (emphasis added).

Along similar lines, the state board of elections concluded that

> there is nothing in the Election Law which limits the use of surplus funds. * * * [T]here is nothing in the Election Law which would prohibit an elected offi-

cial from using surplus campaign funds for any lawful purpose * * *.

New York State Board of Elections, 1979 Opinion No. 3.

The government seizes upon the term "surplus funds" in these opinions as limiting their applicability only to those funds that are left over at the end of a campaign. We do not think this is a fair interpretation of the principle discussed, and in any event, there was nothing in the New York statutory system covering campaign funds to warrant drawing a restrictive distinction between "surplus" and "active" campaign funds that would permit personal use of the former but prohibit it as to the latter.

■ The government also attempts to deduce a prohibition upon personal use of campaign funds from Election Law § 17–140. Both the language and history of that lengthy statute, which was enacted long before the modern concept of campaign committees and campaign funds was developed, reveal that its purpose was not to limit the uses to which contributed campaign moneys could be put, but to regulate how any moneys, whether contributed to a candidate or drawn from his own personal resources, could be spent in connection with election campaigns.

At the relevant times, § 17–140 read: Any person who directly or indirectly by himself or through any other person in connection with or in respect of any election:

1. On a day of a general, special or primary election, gives or provides, or causes to be given or provided, or shall pay for wholly or in part, any meat, drink, tobacco, refreshment or provision, to or for any person, other than persons who are official representatives of the board of elections or political parties and committees and persons who are engaged as watchers, party representatives or workers assisting the candidate; or,

2. Pays, lends or contributes, or offers or promises to pay, lend or contribute any money or other valuable consideration, for any other purpose than the following matters and services at their rea-

sonable, bona fide and customary value is guilty of a class A misdemeanor: [There follows a list of authorized expenditures such as publicity, rent, telephone, travel, etc.]

Nothing in this section refers to campaign committee funds or in any other way identifies the source of the moneys from which expenditures may be made. The clear intent was to regulate what could be spent "in respect of any election", and not to regulate or restrict a candidate's expenditures for nonelection purposes.

Finally, the New York legislature, after argument of this appeal, enacted Chapter 152 of the Laws of 1985 which directly addresses this issue. It added to the Election Law a new section 14–130 which provides:

Campaign funds for personal use. Contributions received by a candidate or a political committee may be expended for any lawful purpose. Such funds shall not be converted by any person to personal use which is unrelated to a political campaign or the holding of a public office or party position.

■ Had this new provision been in effect during the period covered by Pisani's indictment, we would not hesitate to affirm his convictions here. But since no similar provision had ever been enacted previously, we conclude that prior to 1985 a candidate in New York state was not prohibited from using campaign funds for personal purposes. That being so, the central premise underlying the fraudulent scheme charged against Pisani fails.

As a fall-back position the government, on appeal, has shifted its emphasis. Now it argues that even if the scheme to defraud did not involve embezzlement and conversion of campaign funds, the evidence shows that Pisani fraudulently schemed to file false reports of how he used his campaign funds. In essence, the government argues that Pisani reported the information falsely, and that he did so to conceal the truth of his personal expenditures from the board of elections and from his contribu-

tors, who would not have continued to support him had they known he was using some of their contributions for private investments and other personal purposes.

As to a claimed scheme to defraud the state board of elections, there is no indication before us that had the board known the truth about the nature of the expenditures it would have been able or willing to take any corrective action. As to the claimed scheme to defraud the contributors, there is scant evidence to establish that contributors entertained the expectations attributed to them by the government. While one witness, Pisani's former law partner, testified that he had contributed to Pisani's campaign funds and expected that the money would be spent for campaign expenses, four others who testified about how they expected their contributions to be used all agreed that they did not care whether Pisani used them for political or personal purposes. Nor was there any evidence that any of Pisani's political contributors ever saw or heard about the contents of the disclosure statements he filed with the board of elections.

■ In any event, we think this shift in theory and emphasis in the government's case comes far too late to sustain Pisani's campaign fund mail fraud convictions. We need not now decide whether a mail fraud charge might be based on misleading contributors through false reports of campaign fund expenditures, because that is not the case that the government brought against Pisani and tried to the jury. Since the government has failed to uphold the legal premise of the fraudulent scheme on which it chose to prosecute Pisani, namely, that personal use of campaign funds was prohibited under New York law, the campaign fund mail fraud convictions must be dismissed.

CONCLUSION

The convictions on the campaign fund mail fraud counts are reversed, and those counts of the indictment are dismissed. The convictions on the income tax counts are reversed, and those counts are remanded for a new trial. The conviction on the law practice mail fraud count is affirmed.