106 F.3d 409
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Marytza ALTAMIRANO, Defendant-Appellant.
 No. 95-50597.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 5, 1996.
Decided Dec. 27, 1996.
 
 Before: GOODWIN, WIGGINS, and NOONAN, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Marytza Altamirano appeals her conviction of transporting more than $10,000 outside the United States without filing a customs report in violation of 31 U.S.C. § 5316(a)(1)(A) and of lying to the U.S. Customs Service about the amount of money she was carrying in violation of 18 U.S.C. § 1001. She challenges both her conviction and the district court's order of forfeiture. We affirm the conviction but set aside the forfeiture order.
 
 BACKGROUND
 
 3
 Altamirano and her travelling companion, Allen Boren, checked in at the ticket counter and proceeded to the boarding area for their flight to Paris without reporting to the customs officer that Altamirano was transporting more than $10,000 outside the United States. After Altamirano had entered the jetway, Customs Inspector Salvatore Zito stopped Boren and asked to see his travel documents. Boren responded that Altamirano was carrying his papers and retrieved her from the jetway. Zito asked Altamirano whether she was transporting more than $10,000 outside the country. Upon inspecting her bags, he found $70,500. When Zito asked why Altamirano failed to tell him about the currency, both she and Boren protested that she had told him she was carrying "70K."
 
 
 4
 Customs agents detained Altamirano and Boren and questioned them separately. During Altamirano's interview, she objected to the agents' taking her money out of the room and requested a lawyer. She was then handcuffed and one agent asked her to calm down. Forty five minutes later, two new customs officers arrived, took Altamirano to another room, and advised her of her rights. She remained handcuffed to a chair throughout this interview. Altamirano answered some of the agents' questions. When asked about the source of the money she was carrying, she responded, "If you're going to ask me about my finances, I'm going to want to speak to a lawyer first." Altamirano also stated that she did not want to discuss her relationship with Boren. She continued to answer the agents' questions about other matters, however.
 
 
 5
 The government conceded that the statements Altamirano made to customs investigators after she requested counsel were inadmissible in its case in chief. It argued, however, that the statements could be used to impeach Altamirano if she testified at trial. After a hearing, the district court ruled that because Altamirano made the statements voluntarily, they could be used for impeachment even though they were obtained in violation of her Fifth Amendment right to counsel.
 
 
 6
 Altamirano testified at the hearing on her motion in limine to suppress statements she made at the interview. She did not testify at trial.
 
 VOLUNTARINESS
 
 7
 Altamirano contends that the district court's ruling that her statements were voluntary, and therefore could be used for impeachment, prevented her from taking the stand in her own defense. She argues that by handcuffing her upon her request for counsel, the investigators coerced her into talking to the officers. Altamirano may raise this issue on appeal even though she did not testify at trial. See United States v. Chischilly, 30 F.3d 1144, 1150-51 (9th Cir.1994), cert. denied, 115 S.Ct. 946 (1995).[1]
 
 
 8
 We review de novo the voluntariness of a defendant's statements to law enforcement investigators. See United States v. Andaverde, 64 F.3d 1305, 1310 (9th Cir.1995), cert. denied, 116 S.Ct. 1055 (1996). We review the factual findings underlying the district court's voluntariness determination for clear error. See United States v. Wauneka, 842 F.2d 1083, 1087 (9th Cir.1988).
 
 
 9
 To determine whether the statements made by Altamirano after she requested counsel were voluntary we must evaluate "the totality of the circumstances" of her interrogation to "determine whether 'the government obtained the statement by physical or psychological coercion or by improper inducement so that [her] will was overborne.' " United States v. Harrison, 34 F.3d 886, 890 (9th Cir.1994) (quoting United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir.1988)). The government bears the burden of proving that Altamirano statements were voluntary. See Wauneka, 842 F.2d at 1087. The trial court found that the statements were voluntary in fact, and we agree.
 
 
 10
 Altamirano did not make the statements at issue immediately after being handcuffed. We therefore look first to the initial conduct of the investigators to determine if it was coercive. See Colorado v. Connelly, 479 U.S. 157, 167 (1986); Collazo v. Estelle, 940 F.2d 411, 415 (9th Cir.1991) (en banc), cert. denied, 502 U.S. 1031 (1992). Second, if it was coercive, we examine whether there was a causal relationship between the act of handcuffing and the statements she made. See Collazo, 940 F.2d at 420-21.
 
 
 11
 While handcuffing Altamirano in immediate response to her request for counsel arguably may have intimidated her, it does not follow that handcuffing was "calculated to pressure [her] into changing her mind about remaining silent." Id. at 416. It is equally possible that handcuffing might provoke silence, or hostility, as that it might provoke admissions. Altamirano offered no evidence other than the timing of her request for counsel and the handcuffing to show that the restraint was designed to be speech coercive. In fact, the district court found that the investigators put on the handcuffs because Altamirano was attempting to prevent them from taking her money out of her sight. See Findings of Fact and Conclusions of Law, United States v. Altamirano, D.C. No. CR-95-680-R, at 2 (Sept. 25, 1995). This finding was supported by the declaration of Customs Inspector Norma Arciniega and her testimony at the hearing on the motion in limine to suppress the statements. We cannot say that this finding was clearly erroneous. See Wauneka, 842 F.2d at 1087.[2]
 
 
 12
 The investigators' behavior in this case does not rise to the level of the conduct we disapproved of in Collazo, Harrison, or United States v. Tingle, 658 F.2d 1332 (9th Cir.1981), cases on which Altamirano relies. In Collazo, the officer explicitly stated that there would be adverse consequences in the way the police approached the defendant's prosecution if he talked to a lawyer. See Collazo, 940 F.2d at 414. We characterized the officer's statement as a "one-sided, unauthorized legal opinion." Id. at 418. There is no evidence to suggest in this case that the handcuffing was intended to dissuade a person from seeking legal advice. Indeed, it might reinforce a person's belief that having a lawyer might be a good idea. Harrison also involved a communication to the defendant that refusing to give a statement would result in harsh treatment during the defendant's prosecution. See Harrison, 34 F.3d at 890. Finally, in Tingle, we held that a defendant's statements were involuntary when made after an officer told her that she would not see her young child for a long time if she refused to cooperate and that she faced a long prison term. See Tingle, 658 F.2d at 1335-36. These direct threats of adverse consequences pose a far greater risk to the free will of suspects than the handcuffing did to Altamirano in this case.
 
 
 13
 Even if Altamirano felt coerced by being handcuffed, however, she did not make the challenged statements in immediate response to the conduct about which she complains. We look at four factors in determining the effect of previous police coercion: (1) whether there was a break in the stream of events sufficient to insulate the statement from the prior coercion; (2) whether the coercive factors had a continuing effect that touched the subsequent statement; (3) whether there was a passage of time, a change in the location of the interrogation, or a change in the identity of the interrogators that interrupted the effect of the coercion; and (4) whether the conditions that would have precluded the use of a first statement had been removed. See United States v. Patterson, 812 F.2d 1188, 1192 (9th Cir.1987), cert. denied, 485 U.S. 922 (1988).
 
 
 14
 In this case there was a break in the time, place, and participants that mitigated the effects of the initial handcuffing. While Altamirano remained handcuffed throughout the evening, two new investigators, who had not been present when the handcuffs were placed on her, questioned her forty-five minutes later in a different room. If the handcuffing intimidated Altamirano, she managed to overcome her timidity at several points in the subsequent questioning when she successfully refused to answer the investigators' questions about a variety topics. We therefore hold that the district court did not commit reversible error in ruling that Altamirano's statements could be used for impeachment if she took the stand.
 
 JUDICIAL INTERFERENCE
 
 15
 "The standard for reversing a verdict because of general judicial misconduct during trial is rather stringent." Kennedy v. LAPD, 901 F.2d 702, 709 (9th Cir.1988). We will reverse for excessive judicial intervention "only if the record shows actual bias or leaves an abiding impression that the jury perceived an appearance of advocacy or partiality." United States v. Laurins, 857 F.2d 529, 537 (9th Cir.1988), cert. denied, 492 U.S. 906 (1989). It is not enough that "the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid." United States v. Pisani, 773 F.2d 397, 402 (2d Cir.1985). Altamirano must demonstrate "a pervasive climate of partiality or unfairness" in order to justify a new trial. United States v. DeLuca, 692 F.2d 1277, 1282 (9th Cir.1982).
 
 
 16
 We have examined closely the entire record. While the experienced trial judge's desire to move the trial along may unfortunately have manifested itself as irritation and impatience, his comments did not deprive Altamirano of a fair trial.
 
 
 17
 First, Altamirano complains that the judge sustained almost all of the government's objections while overruling each defense objection. She fails to note, however, that her counsel made only two objections during her trial. More importantly, Altamirano fails to demonstrate prejudicial error in any of these rulings. As the Second Circuit aptly stated, "[A] trial judge must rule on countless objections, and a simple numerical tally of those sustained and overruled, one which here favors the government, is not enough to establish that the scales of justice were tipped against a defendant.... [W]e will not fault the trial judge simply because defense counsel would have preferred a more favorable scorecard." Pisani, 773 F.2d at 402.
 
 
 18
 Altamirano next asserts that the judge's interruption of
 
 
 19
 defense counsel's examinations and his cross-examination of
 
 
 20
 defense witnesses from the bench impeded her effort to put
 
 
 21
 on a defense. However, "[a] trial judge is more than an
 
 
 22
 umpire, and may participate in the examination of witnesses
 
 
 23
 to clarify evidence, confine counsel to evidentiary rulings,
 
 
 24
 ensure the orderly presentation of evidence, and prevent
 
 
 25
 undue repetition." Laurins, 857 F.2d 529, 537 (9th Cir.1988)
 
 
 26
 . Our review of the trial transcript reveals that the vast
 
 
 27
 majority of the judicial interruptions were for permissible
 
 
 28
 purposes. See R.T. at 71, 72, 75, 89, 214 (Sept. 26-27
 
 
 29
 1995) (preventing repetition of questions that had been
 
 
 30
 asked and answered); id. at 69, 95
 
 
 31
 (preventing elicitation of irrelevant material); id. at 97
 
 
 32
 (preventing delay through counsel movement away from the
 
 
 33
 lectern); id. at 126, 169
 
 
 34
 (preventing counsel from asking leading questions); id. at 129
 
 
 35
 (clarifying testimony and evidence); id. at 231, 232
 
 
 36
 (denying sidebar conferences). The record does show that
 
 
 37
 the judge issued some of his admonitions in a sharper tone
 
 
 38
 than was necessary, but the instances are not sufficiently
 
 
 39
 egregious to necessitate reversal.
 
 
 40
 The trial judge's colloquy with defense witness Allen Boren is pressed as reversible error. By communicating his obvious skepticism that Boren could have signed a customs form without reading it, the judge may have conveyed to the jury his disbelief of the defense argument that Altamirano was unaware of the reporting requirements even though she also had previously signed the same form. This exchange alone, however, did not constitute reversible error. It was an unnecessary comment on a witness's testimony, but did not directly impeach the credibility of the defendant on trial. Altamirano's signature on a customs form was not the only evidence presented of her knowledge of the customs reporting requirements. The government demonstrated that there were signs announcing the currency rules in the departure area. The government also presented evidence that Altamirano had run afoul of customs on a previous occasion, when she failed to report currency on an inbound trip. The judge instructed the jury that his questions during the trial did not represent his view on what verdict they should render. The jury had enough evidence to support an inference that the defendant knew she had a duty to report a departure with currency in excess of $10,000, and that she attempted to evade the requirement.
 
 
 41
 Finally, Altamirano complains that judicial interruptions of her defense counsel's closing argument revealed a personal bias. We have stated that "[i]nterruptions during presentations of counsel are not forbidden, and they may be appropriate where counsel is discussing matters of law whose resolution lies with the court." See United States v. Moreno-Pulido, 695 F.2d 1141, 1146 (9th Cir.1983). Two of the interruptions at issue here involved attempts to clarify the law. See R.T. at 262, 267 (Sept. 27, 1995). In four of the other interruptions, the judge cautioned defense counsel not to phrase his argument in terms of his "beliefs." See id. at 254, 257, 261, 265. The judge also interjected several times during the prosecutor's closing to correct such phrasing. See id. at 239, 243, 245. "From our hindsight we may say that a greater reluctance to intervene may have been warranted," but we conclude that the sum of these interjections does not constitute reversible error. United States v. Eldred, 588 F.2d 746, 751 (9th Cir.1978).
 
 EXCLUSION OF EVIDENCE
 
 42
 Altamirano assigns error to a number of the district court's evidentiary rulings including the court's limitation of the cross-examination of Inspector Sinko, the court's exclusion of Altamirano's statement to Sinko that she was carrying "70k," and the court's exclusion of argument that Altamirano never read the customs form she signed. We review for abuse of discretion each of these rulings. See United States v. Dudden, 65 F.3d 1461, 1469 (9th Cir.1995) (limitation on scope of cross-examination); Crosby, 75 F.3d at 1346 (exclusion of evidence during trial); Beech Aircraft Corp. v. United States, 51 F.3d 834, 842 (9th Cir.1995) (exclusion of evidence during closing argument).
 
 
 43
 We hold that it was not an abuse of discretion for the district court to refuse to allow impeachment of Sinko through extrinsic evidence of the absence of comments in Inspector McIntosh's notes. Defense counsel failed to show that the silence of the notes was evidence that Boren never made the statements Sinko attributed to him. Nor was it an abuse of discretion to exclude Altamirano's statements to Inspector Zito on hearsay grounds. Finally, while we find problematic the court's ruling that the prosecutor could argue by inference from the defendant's signature that she read the customs form but that defense counsel could not argue that she may not have read the form, we conclude that Altamirano was not prejudiced by this ruling because the prosecutor never argued that she read the form. The defendant had every right to decline to give evidence, but her silence did not provide evidence for her lawyer to argue to the jury, any more than it gave the government something to comment about.
 
 THE FORFEITURE
 
 44
 After finding Altamirano guilty, the jury rendered a special verdict in which it found that $69,900 was property involved in Altamirano's attempt to transport currency outside the United States without filing a report. At sentencing, the prosecutor requested that the court place a reference to the forfeiture in its judgment and commitment order and the court agreed. See R.T. at 8 (Nov. 20, 1995). In the order, however, the court simply referenced a fine of $70,000. See Judgment and Probation/Commitment Order, United States v. Altamirano, D.C. No. CR-95-680-R (Nov. 22, 1995). On numerous occasions, both counsel pointed out that it was unclear whether the fine discussed in that order was that reference or whether the court intended an additional fine. We are similarly puzzled about the district court's intentions.
 
 
 45
 The appropriate fine range for Altamirano's offense under the Sentencing Guidelines is $250 to $5000. See U.S.S.G. § 5E1.2(c). A $70,000 fine clearly exceeds the Guidelines maximum. Given the court's acknowledgment that it would reference the forfeiture in its judgment and commitment order, and in light of the court's failure to discuss its massive departure from the Guidelines, we can only construe the court's reference to a fine of $70,000 as a reference to the forfeiture.
 
 
 46
 We recently held, however, that "[f]orfeiture of currency is unconstitutional when the crime to which the forfeiture is tied is a mere failure to report pursuant to 31 U.S.C. § 5316. In such situations, there simply is not an instrumentality relationship between the currency and the crime to satisfy the instrumentality prong of the Excessive Fines test." United States v. Bajakajian, 84 F.3d 334, 337-38 (9th Cir.1996). Because Altamirano's crime was a "mere failure to report" currency in violation of § 5316, "[f]orfeiture of any amount would be unconstitutionally excessive." Id. at 338. We therefore must set aside the forfeiture order.
 
 
 47
 The conviction is AFFIRMED. The forfeiture order is VACATED, and the cause is REMANDED for resentencing if the court considers that a fine within the Sentencing Guidelines is appropriate.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Relying on United States v. Sherwood, 98 F.3d 402, 409 (9th Cir.1996), the government argues that a defendant who does not take the stand is not entitled to review of a district court's voluntariness ruling. Sherwood relied for its terse statement of this proposition on United States v. Behanna, 814 F.2d 1318 (9th Cir.1987), which suggested without analysis that the Supreme Court ruling in Luce v. United States, 469 U.S. 38, 43 (1984), compelled its conclusion. However, in Chischilly, decided after Behanna, we explicitly held that Luce, which concerns the use of prior convictions, does not apply to the use of an involuntary confession "[b]ecause use of an involuntary confession would violate the Constitution" and Luce "recognized that its rule dealt with a preliminary ruling 'not reaching constitutional dimensions.' " Chischilly, 30 F.3d at 1151 (quoting Luce, 469 U.S. at 43). We conclude that Chischilly remains the law of this circuit with regard to appellate review of voluntariness when a defendant does not testify at trial. Moreover, Altamirano testified at the hearing on her motion to suppress the statements. To some degree, this testimony alleviates the Supreme Court's concerns in Luce that a reviewing court will not know "the precise nature of the defendant's testimony." Luce, 469 U.S. at 41
 
 
 [2]
 Altamirano also contends that the district court improperly excluded evidence relevant to its voluntariness determination. We review for abuse of discretion a trial court's decision to exclude evidence. See United States v. Crosby, 75 F.3d 1343, 1346 (9th Cir.1996). We will reverse only if an error in excluding evidence more likely than not affected the verdict. See United States v. Karterman, 60 F.3d 576, 578 (9th Cir.1995). We conclude that none of the exclusions amounts to an abuse of the district court's discretion