[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 21-11596

_____

D.C. Docket No. 1:21-mc-00803-LMM

IN RE:

GRAND JURY SUBPOENA

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 25, 2021)

Before JORDAN, NEWSOM, and LAGOA Circuit Judges.

LAGOA, Circuit Judge:

A former candidate for public office is currently being investigated by a grand

jury for violations of federal law. As part of that investigation, the grand jury has

twice subpoenaed testimony from an attorney who worked for the corporate body

running the candidate's campaign (the "Campaign").[1]    Following the second

subpoena, the attorney informed the United States that he sought to invoke the

attorney-client privilege over his communications with the candidate and the

Campaign regarding the subject of the subpoena—certain financial disclosure forms

filled out by the Campaign and a number of purchases paid for by the Campaign's

bank accounts.  The government, in turn, moved to compel the attorney's testimony,

arguing that the communications fit within the crime-fraud exception to the attorney-

client privilege.  And the Campaign then moved to quash the subpoena.  The district

court granted in part the government's motion to compel and denied the Campaign's

motion to quash.

The Campaign now appeals the district court's order.  After carefully

reviewing the parties' submissions and with the benefit of oral argument, we

conclude that the communications at issue fall within the crime-fraud exception to

the attorney-client privilege and affirm the district court's order.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Under Georgia law, campaigns supporting candidates for public office are

required to disclose to the public information about their contributions and

expenditures.  *See* O.C.G.A. § 21-5-34(b)(1).  For example, for any expenditure

---

[1] In order to not compromise the sealed nature of this case, this opinion eliminates any references to the names of the parties and/or targets of the investigation.

greater than $100, the campaign must publicly disclose the "amount and date of expenditure, the name and mailing address of the recipient receiving the expenditure, and, if that recipient is an individual, that individual's occupation and the name of his or her employer and the general purpose of the expenditure." *Id.* § 21-5-34(b)(1)(B). Georgia requires these disclosures to be filed twice per year during non-election years and five times per year during election years. *Id.* § 21-5-34(c). And they must be personally signed by either the candidate "or the chairperson or treasurer of such candidate's campaign committee." *Id.* § 21-5-34(a)(4).

At issue in this case are certain expenditures made by the Campaign and financial disclosure forms signed by the candidate. On each of the financial disclosure forms at issue, the candidate personally signed the forms disclosing the amount and nature of each expenditure. After obtaining the Campaign's bank records, the government identified a number of expenditures made by the Campaign that appeared personal in nature, including: (1) a $179.28 purchase at a lingerie store; (2) a $4,259 purchase at or for a vacation resort; (3) a $2,079 purchase at a jewelry store; (4) a pair of purchases at a Caribbean resort totaling $1,003.25; and (5) a $1,234.47 purchase of furniture from an online retailer, which was shipped directly to the candidate's mother. Of these five purchases, only the last—the furniture— was disclosed as a campaign expenditure on the Campaign's financial disclosure forms. The general purpose of that expenditure, however, was listed as "Office

3

Supplies." The first four purchases were never disclosed to the State of Georgia on any financial disclosure form signed and submitted by the candidate.

The government is investigating whether the candidate, by making these expenditures, violated the federal wire-fraud statute, 18 U.S.C. § 1343. As part of the government's investigation into the candidate, the FBI interviewed several individuals who donated money to the Campaign. Those individuals said that they made their contributions for the specific purpose of furthering the candidate's chances of being elected, and that they did not intend their contributions to be used for the candidate's personal expenses.

The government identified the Campaign's attorney as a person of interest in the investigation. From 2011 to 2017, the attorney represented the Campaign. And it was during that representation that the Campaign made the expenditures at issue in this case.

On November 25, 2020, the government served the attorney with a grand jury subpoena demanding his testimony on December 21, 2020. The attorney moved to quash that subpoena, but the district court denied his motion. Nevertheless, the government released the attorney from his obligation to testify before the grand jury and instead interviewed him at its offices. During that interview, the attorney revealed that he provided legal advice to the Campaign, including by advising the candidate on completing and filing the financial disclosure forms. The attorney

stated that he reviewed the account statements for the Campaign's bank accounts, created draft campaign disclosure forms, reviewed and revised draft campaign disclosure forms created by other Campaign staff members, and provided those draft forms for review and finalization by the candidate. After finalization and signature by the candidate, the attorney would file the forms with the relevant state and local governmental entities. He also admitted that, during his review of the bank accounts, he observed several expenditures that appeared personal in nature.

About two months after the interview, the government served a second subpoena on the attorney, seeking his testimony at a grand jury proceeding on April 27, 2021. Through counsel, the attorney informed the government that he intended to assert the attorney-client privilege as to his communications with the candidate and the Campaign about the Campaign's expenditures and financial disclosure forms. On April 7, 2021, the government moved to compel the attorney's testimony, arguing that the crime-fraud exception to the attorney-client privilege applied, and on April 22, 2021, the Campaign moved to quash the subpoena.

In its motion to compel testimony from the attorney, the government stated that it "believes that [the attorney] has relevant information regarding: (a) expenditures from the [Campaign's] bank accounts, and (b) the campaign financial disclosure forms filed by [the Campaign]." Based on its interview of the attorney, the government in its motion to compel proffered the following information:

5

[The attorney] stated that his work as a lawyer for the [Campaign] began in approximately 2011.  It continued through 2017.  [The attorney's] role included providing legal advice to the campaign on completing and filing the Georgia-required campaign financial disclosure form.  Those forms must be completed and filed twice per year during non-election years, and five times per year during election years.  As provided by Georgia law, the campaign disclosure forms must include all campaign expenditures over $100.  See O.C.G.A. § 21-5-34(b)(1)(B).  The Grand Jury's investigation has revealed that the [Campaign] opened and used several bank accounts in its corporate name.

[The attorney] said that in his capacity as a lawyer for the [C]ampaign, he reviewed the bank account statements for the [C]ampaign's bank accounts, created draft campaign disclosure forms, reviewed and revised draft campaign disclosure forms created by other campaign staff members, and provided those draft forms for review and finalization by [the candidate].  After [the candidate's] finalization, [the attorney] filed the final campaign disclosure forms with the relevant state or local governmental entity.  And [the attorney] said that during his review of campaign bank accounts in order to complete the campaign disclosure forms, he repeatedly saw expenditures from the campaign bank accounts that appeared to him to be obviously personal in nature, as opposed to being legitimate campaign expenditures.  [The attorney] stated that this occurred throughout the time he was representing the campaign, and that these were not isolated incidents.

Because the attorney invoked the attorney-client privilege "in response to any questions regarding [his] communications with [the candidate] regarding expenditures from the [Campaign's] bank accounts and the campaign disclosure forms [he] prepared and filed for the [C]ampaign," the government in its motion to compel sought an order "requiring [the attorney] to provide testimony about his communications with [the candidate] regarding the [Campaign's] campaign expenditures, and the preparation and filing of the campaign disclosure forms for

6

that campaign, to the Grand Jury" because the crime-fraud exception to the attorney-client privilege "applie[d] to any legal advice that [he] gave on those topics." The government further explained that "apparently personal expenditures were made from the campaign account in 2013 through 2017, and those expenditures were either omitted from the campaign disclosure forms or incorrectly described on the forms."

On April 22, 2021, the district court held a hearing on the government's motion to compel and the Campaign's motion to quash. On April 26, 2021, the district court entered a written order denying the Campaign's motion to quash and granting in part the government's motion to compel. The district court found that some of the attorney's legal advice and communications fell within the crime-fraud exception to the attorney-client privilege and ordered the attorney to testify as to his communications and advice to the candidate and Campaign regarding the personal expenditures at issue. The district court, however, limited the government's questioning to the time period during which the attorney served as the Campaign's attorney.

Specifically, the district court ordered the attorney to testify regarding the following topics for the period of time between January 1, 2013, and December 31, 2017:

> 1. For any expenditures that [the attorney] noted or identified to [the candidate] as personal expenditures from the campaign's bank

7

accounts, all communications and advice between [the attorney] and [the candidate] about:

> a. The legality and permissibility of making that personal expenditure out of campaign funds;
> b. What action, if any, [the candidate] or others should take regarding that personal expenditure;
> c. What action, if any, [the candidate] or others planned to take regarding that personal expenditure;
> d. What action, if any, [the candidate] or others did take regarding that personal expenditure; and
> e. Whether that personal expenditure should be disclosed on the campaign expenditure disclosure reports and why;

2. For any expenditures that [the attorney] noted or identified to [the candidate] as potentially personal expenditures from the Campaign's bank account that required further documentation, all communications and advice between [the attorney] and [the candidate] about:

> a. The reason the expenditure needed further explanation or documentation;
> b. The explanation or documentation, if any, provided by [the candidate];
> c. Why the potentially personal expenditure was ultimately included on or excluded from the campaign disclosure report;
> d. What action, if any, [the candidate] or others should take regarding the potentially personal expenditure;
> e. What action, if any, [the candidate] or others planned to take regarding that potentially personal expenditure; and
> f. What action, if any, [the candidate] or others did take regarding that potentially personal expenditure.

3. All communications and advice between [the candidate] and [the candidate] regarding what actions would be required if personal expenditures occurred from the campaign funds, including whether personal expenditures must be reimbursed and whether personal expenditures must be disclosed on campaign expenditure reports.

8

The Campaign appealed the order, and the government filed a motion to expedite the appeal, which we granted.

## II.   STANDARD OF REVIEW

We review the district court's application of the crime-fraud exception to the attorney-client privilege for an abuse of discretion. *See In re Grand Jury (G.J. No. 87-03-A)*, 845 F.2d 896, 898 (11th Cir. 1988); *In re Grand Jury Investigation (Schroeder)*, 842 F.2d 1223, 1226–27 (11th Cir. 1987).

## III.   ANALYSIS

The issue presented in this appeal is whether the district court erred in compelling the attorney's testimony before the grand jury.  The Campaign argues that, because the attorney's communications at issue are shielded by the attorney-client privilege, its motion to quash should have been granted.  The government responds that the privilege does not apply here because the communications at issue are closely related to a crime that was ongoing between 2013 to 2017—namely, wire fraud by the candidate.

The attorney-client privilege attaches to all "communications made in confidence by a client to an attorney for the purposes of securing legal advice or assistance." *In re Grand Jury (G.J. No. 87-03-A)*, 845 F.2d at 897.  However, the "attorney-client privilege does not protect communications made in furtherance of a crime or fraud." *In re Grand Jury Investigation (Schroeder)*, 842 F.2d at 1226.  We

9

apply a two-part test to determine whether the crime-fraud exception applies to an otherwise privileged communication:

> First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

*Id.*

The Campaign challenges both prongs here. It argues that the government has failed to establish a prima facie case of a federal wire-fraud violation to satisfy the first prong and that the district court read the second prong too broadly by requiring only a "relatedness" between the communication and crime, rather than that the communication actually be in *furtherance* of the crime.

### A.     <u>First Prong</u>

As to the first prong, the government's burden is satisfied by a "showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed." *Id.* At the grand-jury stage, this does not require the government to "prove the existence of a crime or fraud beyond a reasonable doubt." *See In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985). Rather, this prima facie showing must only "have some foundation in fact," and although "mere allegations of criminality are insufficient," the government may

10

meet its burden by providing "a good faith statement . . . as to what evidence is before the grand jury." *In re Grand Jury Investigation (Schroeder)*, 842 F.2d at 1226. This is a low hurdle. And, in an appeal like this one, there is an added layer of deference as the district court's prima facie determination is reviewed only for abuse of discretion. *See id.*

Here, the violation at issue is wire fraud under 18 U.S.C. § 1343. "The elements of wire fraud are '(1) intentional participation in a scheme to defraud, and, (2) the use of the interstate . . . wires in furtherance of that scheme.'" *United States v. Estepa*, 998 F.3d 898, 908 (11th Cir. May 25, 2021) (alteration in original) (quoting *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009)). "A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." *Id.* (quoting *Maxwell*, 579 F.3d at 1299).

With the above principles in mind, the government has satisfied its burden of establishing a prima facie case of wire fraud against the candidate at the grand jury stage. In support of its motion to compel, the government proffered evidence that a campaign donor—interviewed as part of the investigation—said that he donated money to the Campaign with the intention that the candidate "would use the money for purposes related to his official position" as an elected official and that "he would not have given a contribution if he knew that [the candidate] was going to spend the

money on personal expenditures." The government also proffered evidence that the contribution at issue—donated at an out-of-state fundraiser—was deposited in the Campaign's bank account and that account later was used to make allegedly personal purchases in the Caribbean. Additionally, the government proffered evidence that some of the personal expenditures were *never* reported on the state-required financial disclosure forms and that the one expenditure that *was* reported was *mis*-reported.

A campaign fundraiser constitutes a solicitation of funds for a campaign. By asking for money for an election bid, a candidate is representing to potential donors that the money will be used for that campaign. And by soliciting monies for this political endeavor, but then utilizing those funds for a personal endeavor, the candidate engages in a scheme to defraud. Because at least some of the expenditures at issue here were made over the internet such as the furniture purchased from an online retailer as well as credit card purchases at a Caribbean resort—this scheme to defraud became a case of federal wire fraud.

The Campaign counters that the evidence is insufficient to show either a prima facie case of *intent* to defraud, or that the subsequent specific use of the funds was integral to the bargain. In essence, the Campaign argues that there could not have been a scheme to defraud because the only thing donors could expect upon making

a campaign contribution was that the contribution be "placed in a campaign fund, which is exactly what happened here."

But this argument fails for two reasons: it overstates the government's burden at this stage of the proceedings and misapprehends the essence of the bargain at issue. First, the government can satisfy the intent prong through circumstantial evidence. *See Estepa*, 998 F.3d at 908. And here, the proffered evidence suggests that the candidate solicited donations for one purpose, diverted those donations to a separate purpose, and then attempted to conceal the nature of his transactions by failing to report them or misreporting them. Indeed, the recurrent instances of solicitation followed by misuse could lead a reasonable juror to believe that, at the time the solicitations were made, the candidate possessed an intent to misuse the donations. *See United States v. Bradley*, 644 F.3d 1213, 1239 (11th Cir. 2011) ("A jury may infer an intent to defraud from the defendant's conduct." (quoting *Maxwell*, 579 F.3d at 1301)). And it is also worth noting that each of the allegedly offending expenditures benefited the candidate. *See United States v. Naranjo*, 634 F.3d 1198, 1207 (11th Cir. 2011) ("Evidence that a defendant personally profited from a fraud may provide circumstantial evidence of an intent to participate in that fraud."). Finding intent here, particularly given the government's burden at the grand jury stage, is a matter of "reasonable inference[], not mere speculation." *United States v.*

13

*Capers*, 708 F.3d 1286, 1297 (11th Cir. 2013) (quoting *United States v. Mendez*, 528 F.3d 811, 814 (11th Cir. 2008)).

And second, a campaign donor's reasonable expectation that his donation will be used for purposes not proscribed by federal and local law goes directly to the essence of the bargain itself—that the funds would be used for the election campaign. The Campaign's suggestion that the only bargained-for agreement between the donors and the Campaign was that the funds be placed in the Campaign's bank account thus ignores the stated purposes for which the donations were solicited.

The Seventh Circuit reached the same conclusion regarding application of the federal mail-fraud statute[2] to a similar campaign-donation scheme in *United States v. Henningsen*, 387 F.3d 585 (7th Cir. 2004). There, a Milwaukee alderman was found guilty of mail fraud for soliciting donations for a re-election campaign but then diverting those funds to pay for certain personal expenses. *Id.* at 587–88. On appeal, the Seventh Circuit upheld the conviction because evidence presented at trial showed that the defendant "solicited donations" with a "pitch to support [his] re-election bid" but then "diverted [those] donations for private use through various

---

[2] "'[T]he only difference between' mail and wire fraud 'is [that] mail fraud requires proof of the use of the mails[ ] while wire fraud requires proof of the use of the wires.'" *United States v. Robertson*, 493 F.3d 1322, 1331 (11th Cir. 2007) (alterations in original) (quoting *Beck v. Prupis*, 162 F.3d 1090, 1095 (11th Cir. 1998)).

methods, including writing checks to cash from the campaign account . . . and writing checks to pay for personal expenses," and then "failed to fully disclose campaign revenue and expenditures in campaign finance reports mandated by the State of Wisconsin." *Id.* at 589. As to the intent prong, the court found that the defendant's intent to defraud is often proved through "circumstantial evidence or by inferences drawn from the scheme itself" and that the prong was satisfied there because of the defendant's extensive "conceal[ment of] his personal use of campaign funds." *Id.* at 590–91.

Each of the findings in *Henningsen* is also present here. The government has proffered evidence that: (1) campaign donations were solicited at a campaign fundraiser; (2) the donations were deposited into a campaign account that was then used to make allegedly personal expenditures; and (3) the Campaign misrepresented the nature of (or omitted) those purchases on a subsequent financial disclosure form required by state law. Moreover, we note that the *Henningsen* appeal was heard following a trial, while the government here has proffered the evidence at the grand jury stage. We have been particularly careful not to turn "motions in opposition to grand jury subpoenas . . . into mini-trials" because if "courts always had to hear testimony and conflicting evidence on such matters, the rationale behind the prima facie standard—the promotion of speed and simplicity at the grand jury stage—would be lost." *In re Grand Jury (Schroeder)*, 842 F.2d at 1226.

15

While not binding on this Court, we find persuasive a number of district court decisions that have reached the same conclusion and found that the misappropriation for personal use of campaign donations can constitute a scheme to defraud. For example, in *United States v. Reed*, Crim. Action No. 15-100, 2015 WL 5944333 (E.D. La. Oct. 13, 2015), the district court refused to dismiss an indictment against an elected official who was "alleged to have solicited campaign funds from donors on the premise that the funds would be used to facilitate his reelection and then used those funds to pay for personal expenses unrelated to his campaign." *Id.* at *1. The district court found that the indictment sufficiently charged that the campaign contributors had been subject to a scheme to defraud because, "while the donors may not have control as to [how] their money is used . . . , they were deceived into parting with something of value to them on the basis that, at the very least, their money would be used to fund a reelection campaign." *Id.* at *7. Similarly, in *United States v. Delle Donna*, 552 F. Supp. 2d 475, 480 (D.N.J. 2008), *aff'd*, 366 F. App'x 441 (3d Cir. 2010), the district court refused to dismiss an indictment charging mail fraud against a former mayor who was alleged to have taken campaign donations and diverted them for "personal use" before using "the mails to file [financial disclosure] forms that intentionally failed to disclose the cash contributions." And in *United States v. Fullwood*, No. 3:16-cr-48-J-34JBT, 2016 WL 5106940 (M.D. Fla. Sept. 20, 2016), the district court refused to dismiss an indictment charging a former Florida

16

state representative with wire fraud where the government alleged that he "solicited donations . . . to support his election and reelection to the Florida House of Representatives, but later transferred funds from his campaign account into a separate bank account and used those funds on personal expenses." *Id.* at *1. Each of these cases is on all-fours with the instant case, and in each the district court found that the government had adequately alleged a scheme to defraud.[3]

---

[3] To our knowledge, the only case in which a court has found that such an election scheme does not constitute a scheme to defraud is *United States v. Pisani*, 773 F.2d 397 (2d Cir. 1985). *Pisani*, however, is distinguishable. In *Pisani*, the Second Circuit found that the evidence presented at trial was insufficient to convict a former New York Senator with wire fraud after he collected campaign donations and diverted them for personal use. *See id.* at 407–09. But a critical fact—present in the cases discussed above but absent in *Pisani*—explains the divergent results. The Second Circuit's decision was based at least in part on the premise that "no provision of New York law in effect prior to th[e] indictment prohibited a candidate from using campaign funds for personal purposes." *Id.* at 409. Indeed, the Second Circuit noted that New York state had subsequently added a provision forbidding the personal use of campaign funds. Specifically, the court stated:

> [h]ad this new provision been in effect during the period covered by Pisani's indictment, we would not hesitate to affirm his convictions here. But since no similar provision had ever been enacted previously, we conclude that prior to 1985 a candidate in New York state was not prohibited from using campaign funds for personal purposes. *That being so, the central premise underlying the fraudulent scheme charged against Pisani fails*.

*Id.* at 410 (emphasis added).

The Second Circuit also rejected the government's fallback position that "Pisani fraudulently schemed to file false reports of how he used his campaign funds," by reporting "information falsely" and by "conceal[ing] the truth of his personal expenditures from the board of elections and from his contributors, who would not have continued to support him had they known he was using some of their contributions . . . for personal purposes." *Id.* at 410–11. The court explained that there was "no indication . . . that had the board known the truth . . . it would have been able or willing to take any corrective action." *Id.* at 411. Furthermore, there was "scant evidence to establish that contributors entertained the expectations attributed to them by the government." Indeed, the Second Circuit noted in its decision that the overwhelming majority of the witnesses who testified for the government "did not care whether Pisani used them for political

17

Although we do not opine on whether the evidence proffered by the government would be sufficient to convict, we do conclude that the government has presented a prima facie case of wire fraud and that the district court therefore did not abuse its discretion in finding that the government satisfied its burden under the first prong of the crime-fraud exception.

The Campaign, however, raises one final ground in support of reversal, arguing that the application of the wire-fraud statute here would violate the principles of federalism expounded on by the Supreme Court in *McDonnell v. United States*, 136 S. Ct. 2355 (2016). In that case, the federal government indicted a former Virginia Governor for violations of federal bribery law, among other things. *Id.* at 2361. To convict on the bribery charge, the government was required to prove that the Governor agreed to commit an "official act" in exchange for the gifts at issue. *Id.* At issue on appeal was the proper interpretation of the term "official act." *Id.* at 2366–67. After concluding that the plain meaning of the statute did not support the government's expansive interpretation of the term, the Supreme Court noted that reading the statute too broadly would also raise significant federalism concerns,

---

or personal purposes." *Id.* Here, however, the evidence proffered by the government establishes that multiple campaign contributors made their contributions with the belief that they would not be used for personal expenses, and Georgia law further forbids the use of campaign funds for personal purposes. *See* O.C.G.A. § 21-5-33 ("[c]ontributions to a candidate, a campaign committee, or a public officer holding elective office. . . shall be utilized only to defray ordinary and necessary expenses . . . incurred in connection with such candidate's campaign for elective office or such public officer's fulfillment or retention of such office.")

18

because it is the prerogative of the state "to regulate the permissible scope of interactions between state officials and their constituents." *Id.* at 2373.

The Campaign's reliance on *McDonnell* is misplaced. The Supreme Court in *McDonnell* did not hold that the federalism concerns undergirding its decision overrode the plain meaning of the statute; to the contrary, it held that *because* the "more limited interpretation of 'official act' is supported by both text and precedent, [it] decline[d] to 'construe the statute in a manner that leaves its outer boundaries ambiguous and involves the federal government in setting standards' of 'good government for local and state officials.'" *Id.* (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987)).

Here, however, the wire-fraud statute at issue is not ambiguous and does not on its face implicate a state's sovereign interests in regulating state and local government. And the Campaign (to its credit) does not argue that a candidate for public office in Georgia has the state-sanctioned prerogative to divert campaign funds for personal expenditures. In fact, the Campaign seems to concede that a candidate's decision to do so would *violate* Georgia law. As such, the Campaign's constitutional argument fails. Unlike defining the term "official act" in *McDonnell*—a term fraught with federalism concerns given a state's right to regulate the relationship between its officials and its citizenry—defining "fraud" does not pose such a constitutional problem.

**B.    Second Prong**

The second prong of the crime-fraud exception is satisfied by "a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it." *In re Grand Jury Investigation (Schroeder)*, 842 F.2d at 1226. At issue here is whether the attorney's communications with the Campaign during his tenure as its attorney are sufficiently related to the wire-fraud scheme discussed above.

As an initial matter, the parties quarrel over the correct formulation of the standard that is to be applied to the second prong of the crime-fraud exception. The government argues that, consistent with our precedent, all that need be shown is that the "communication is *related to* the criminal or fraudulent activity established under the first prong." *Id.* at 1227 (emphasis added). The Campaign, on the other hand, argues that because the purpose of the second prong is "identifying communications that should not be privileged because they were used to further a crime or fraud," *id.*, only communications made *in furtherance* of a crime or fraud fit within the exception.

Our caselaw has recognized that different "[c]ourts have enunciated slightly different formulations for the degree of relatedness necessary to meet th[e] standard." *Id.* (collecting cases). Indeed, some circuits have disclaimed any focus on "relatedness" and instead focused exclusively on whether the communications at

issue were made "in furtherance" of the crime or fraud. *See, e.g.*, *In re Grand Jury Invest.*, 810 F.3d 1110, 1113 (9th Cir. 2016); *In re Grand Jury Subpoena*, 745 F.3d 681, 693 (3d Cir. 2014); *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989); *In re Antitrust Grand Jury*, 805 F.2d 155, 168 (6th Cir. 1986). Historically, however, our circuit has taken a less restrictive view of the degree of relatedness required, explaining that "the requirement that legal advice must be related to the client's criminal or fraudulent conduct should not be interpreted restrictively." *In re Grand Jury Investigation (Schroeder)*, 842 F.2d at 1227.

Fortunately, however, we need not utilize this case to delineate the precise contours of the test because, regardless of which formulation is utilized, the government prevails. Even if as the Campaign argues, the second prong of the exception covers only communications which "advance, or [which] the client [] intend[s] . . . to advance, the client's criminal or fraudulent purpose," *In re Grand Jury*, 745 F.3d at 693, the attorney's advice here would fit that description. This is because the advice here was obtained by the candidate *after* the personal purchases were made, *before* the financial disclosure forms were filed, and *from* an attorney who had knowledge of the personal purchases—i.e., the ongoing criminal or fraudulent activity.

A review of the government's proffer makes this plain. In support of its motion to compel, the government proffered evidence—which the Campaign does

not dispute—related to the nature of the communications that the attorney had with the Campaign and the candidate during his tenure as the Campaign's attorney. Specifically, the evidence relates to statements the attorney made to the government during an interview that followed the issuance of the government's first subpoena to him. In that interview, the attorney stated that his work for the Campaign began in 2011 and ended in 2017. During that time, he provided legal advice to the Campaign related to completing and filing the financial disclosure forms now at issue. He said that, in that role, he reviewed the Campaign's bank account statements, created draft disclosure forms, reviewed and revised draft disclosure forms, and filed the final version of the forms following the candidate's finalization. Critically, the attorney stated that, during his review of the bank statements, he repeatedly saw expenditures from the bank accounts that appeared personal in nature.

The district court found that the communications at issue were sufficiently related to the wire-fraud scheme and ordered the attorney to testify regarding the advice he gave to, and the communications he had with, the candidate related to the personal expenditures during the time of the alleged fraud—2013 to 2017.

We find no abuse of discretion in the district court's holding. The evidence proffered by the government shows that the attorney observed personal expenditures from the Campaign's bank accounts and reviewed and revised the financial disclosure forms that were meant to detail the nature of the Campaign's expenditures

22

as required by Georgia law.  The attorney's own interview with the government suggests that he revised those forms *after* becoming aware of the personal expenditures and *before* the forms were officially filed.  Additionally, the filed disclosure forms show that the general purpose of at least one of the alleged personal expenditures—the furniture purchased from an online furniture store—was listed as "Office Supplies."  And the other four expenditures identified by the government were never disclosed on any filed financial disclosure forms.

Because the attorney's role in the Campaign was to provide legal advice, including, as relevant here, in relation to the Campaign's requirement of filing its financial disclosure forms, the government has shown a sufficient nexus between the alleged "criminal or fraudulent activity" and the communications at issue to pierce the attorney-client privilege.  To reiterate: the candidate is alleged to have committed fraud by soliciting campaign donations and then diverting those donations to pay for personal items.  Georgia law, however, requires campaigns to disclose to the public information about the amount and nature of any expenditures greater than $100 made by a campaign.  After making the personal expenditures at issue, but *before* filing his financial disclosure forms, the candidate sought or obtained legal advice from the attorney regarding his obligations under Georgia law.  We find it significant that, at this time, the personal expenditures had already been made—and that the subsequently filed disclosure forms either distorted the nature of the expenditures or

failed to list them altogether.  "[A]ny legal assistance [the candidate] received in [regards to the expenditures] he did not intend to report is related to his [fraud]. Likewise any assistance [the candidate] received in [filing the disclosure forms in which] he did not report [those expenditures] is related to his [fraud]."  *See In re Grand Jury Investigation (Schroeder)*, 842 F.2d at 1227.

Our caselaw provides ample support for this conclusion.  In *In re Grand Jury Investigation (Schroeder)*, for example, the client was under investigation for tax evasion.  *Id.* at 1227.  Despite the fact that "the record d[id] not specify the matters on which" the attorney offered the client legal advice, we affirmed the piercing of the privilege as to any "legal assistance [the client] received in disposing of income he did not report" and any advice "received in generating income he did not intend to report."  *Id.* at 1227–28.  This is because, despite the fact that the crime of tax evasion relates only to the *concealment* of income, any advice acquired by the client in relation to the *disposal* or *generation* of income would necessarily have furthered his ability to *conceal* it.  *See id.*

Here, as in *In re Grand Jury Investigation (Schroeder)*, the communications at issue—even if their specific content is as of yet uncertain—are sufficiently in furtherance of the crime of wire fraud to justify the piercing of the privilege. Because the attorney's role in the campaign was to ensure compliance with Georgia law as it related to the filing of the financial disclosure forms, and because the legal

advice at issue was obtained *after* the personal expenditures were made and *before* the filing of the forms, the advice "advance[d], or [at the very least] the client [] intend[ed] the advice to advance, the client's criminal or fraudulent conduct." *In re Grand Jury Subpoena*, 745 F.3d at 693.

In short, regardless of which party's formulation of the second prong is utilized, we cannot conclude that the district court abused its discretion. We therefore conclude that the communications at issue fall within the crime-fraud exception to the attorney-client privilege and affirm the district court's order.[4]

**AFFIRMED.**

---

[4] We express no view on whether the evidence proffered by the government here would be sufficient to establish guilt beyond a reasonable doubt, as we are only determining whether the government made a prima facie case as to the crime-fraud exception.